IN THE SECOND DISTRICT COURT OF APPEAL, LAKELAND, FLORIDA

January 20, 2016


In Re Estate of Virginia E. Murphy.         )
                                            )
_____          )
                                            )
JACQUELINE ROCKE,                           )
                                            )
            Appellant,                       )
                                            )
v.                                          )      Case No. 2D14-4107
                                            )
AMERICAN RESEARCH BUREAU;                   )
CHARLES FRETWELL; ERWIN                     )
FRETWELL; JOHN FRETWELL;                    )
LAURA FRETWELL; SUSAN                       )
FRETWELL; JAMES WINFIELD                    )
FRETWELL; VICTORIA FRETWELL                 )
SCOTT; JAMES E.THURMAN;                     )
ALBERT R. WELSH, III, as personal           )
representative of the estate                )
of Albert R. Welsh, II,                     )
                                            )
            Appellees.                       )
_____          )


BY ORDER OF THE COURT:

    Appellees, James Fretwell, Erwin Fretwell, Charles Fretwell, Victoria Fretwell

Scott, Susan Fretwell, and Laura Fretwell's motion for rehearing is denied and the

Motion for Certification of Conflict is granted.  The prior opinion dated November 6,

2015, is withdrawn, and the attached opinion is issued in its place, essentially identical

to the original opinion except for the addition of certifying conflict.  No further motions for

rehearing will be entertained.

I HEREBY CERTIFY THE FOREGOING IS A
TRUE COPY OF THE ORIGINAL COURT ORDER.


_____
MARY ELIZABETH KUENZEL
CLERK

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT


In re Estate of Virginia E. Murphy.    )
       )
_____)
       )
       )
JACQUELINE ROCKE,    )
       )
      Appellant,    )
       )
v.    )    Case No. 2D14-4107
       )
AMERICAN RESEARCH BUREAU;    )
CHARLES FRETWELL; ERWIN    )
FRETWELL; JOHN FRETWELL;    )
LAURA FRETWELL; SUSAN FRETWELL;   )
JAMES WINFIELD FRETWELL;    )
VICTORIA FRETWELL SCOTT; JAMES E. )
THURMAN; ALBERT R. WELSH, III,    )
as personal representative of the estate   )
of Albert R. Welsh, II,    )
       )
      Appellees.    )
_____)

Opinion filed January 20, 2016.

Appeal from the Circuit Court for Pinellas
County; Lauren C. Laughlin, Judge.

Wm. Fletcher Belcher and Angela M.
Adams of Law Offices of Wm. Fletcher
Belcher, St. Petersburg, for Appellant.

Michael R. Kangas of Phillip R. Baumann,
P.A., Tampa, for Appellees James Fretwell;
Erwin Fretwell; Charles Fretwell; Victoria
Fretwell Scott; Susan Fretwell and Laura
Fretwell.

C. Bryant Boydstun, Jr. of Marone Law
Group, PLC, St. Petersburg, for
Appellee James T. Thurman, Jr.

Bonnie S. Satterfield, Coral Springs,
for Appellee American Research Bureau.

Charles W. Gerdes and Brandon S.
Vesely, St. Petersburg, of Keane,
Reese, Vesely & Gerdes, P.A.,
for Appellee Albert E. Welsh, III as
Personal Representative of the Estate of
Albert E. Welch, II.

LUCAS, Judge.

At the age of 107, Virginia E. Murphy passed away, leaving behind an estate worth nearly twelve million dollars, a series of wills, a phalanx of potential heirs, and extensive litigation.  Following a trial, appeal, and remand from this court, the probate court entered an order in which it concluded that the vast majority of Mrs. Murphy's estate should pass through intestacy.  For the reasons explained below, we are compelled to reverse the probate court's order following remand because it failed to apply the presumption of dependent relative revocation to Mrs. Murphy's last will.

I.

A.

Born in 1899, Virginia Murphy died on September 6, 2006, after more than a decade of declining health and acuity.  Her parents and husband predeceased her, and she had no children or siblings.  In the years before her passing, Mrs. Murphy executed a number of wills prepared by her longtime attorney, Jack S. Carey, including her last will and testament dated February 2, 1994 ("1994 will").  When Mrs. Murphy

- 2 -

died, Mr. Carey filed a Petition for Administration submitting the 1994 will to probate. The 1994 will named Mr. Carey as personal representative of Mrs. Murphy's estate; and it purported to leave the bulk of that estate to Mr. Carey, Gloria DuBois (Mr. Carey's legal assistant), and George Tornwall (Mrs. Murphy's accountant, who died the year before Mrs. Murphy passed away).

Upon learning of the probate proceedings, Mrs. Murphy's second cousin, Jacqueline "Jackie" Rocke, a devisee under one of Mrs. Murphy's prior wills, filed an objection to the residuary devises in the 1994 will. In her objection, Ms. Rocke alleged undue influence on the part of Mr. Carey and Ms. DuBois over Mrs. Murphy. The case proceeded through discovery, motion hearings, and pleading amendments, all of which focused primarily on the litigants' competing claims as potential devisees of the estate.

The probate court held a multiday trial in February 2008 on Ms. Rocke's objection to the 1994 will. During the trial, several prior wills executed by Mrs. Murphy were discussed at length. We briefly summarize the testamentary schemes set forth in the last six of Mrs. Murphy's wills that were admitted into evidence below,[1] as they are all pertinent to this appeal:

### May 10, 1989, Will ("1989 Will")

This will, the earliest of the wills admitted into evidence, included a specific bequest to Ms. Rocke in the amount of $150,000 and specific bequests to Mr. Tornwall, Mr. Carey, and Ms. DuBois in the amount of $50,000 each and devised the entire

---

[1] In the interest of brevity, these summaries do not include all of the wills' specific bequests to various charities and caregivers (which were numerous and relatively minor in proportion to the residuary of the estate) but only those germane to this appeal. It appears Mrs. Murphy executed other wills prior to these six, but none of them were made a part of the record in this appeal. None of Mrs. Murphy's last six wills contained a survivorship clause with respect to any beneficiary or devisee.

residuary of the estate to Northwestern University's medical school.

### June 11, 1991, Will ("1991 Will")

This will contained specific bequests to the Northwestern University medical school in the amount of $500,000, Ms. Rocke in the amount of $400,000, and Mr. Tornwall, Mr. Carey, and Ms. DuBois in the amount of $100,000 each, with the residuary of the estate divided in equal fourths between Ms. Rocke, Mr. Tornwall, Mr. Carey, and Ms. DuBois.

### February 4, 1992, Will ("February 1992 Will")

This will, nearly identical to the 1991 will, also contained specific bequests to Northwestern University's medical school in the amount of $500,000, Ms. Rocke in the amount of $400,000, and Mr. Tornwall, Mr. Carey, and Ms. DuBois in the amount of $100,000 each, while the residuary of the estate was divided in equal fourths between Ms. Rocke, Mr. Tornwall, Mr. Carey, and Ms. DuBois.  Ms. Rocke argued below and on appeal that this will's residuary devises (excluding Mr. Carey, Mr. Tornwall, and Ms. DuBois's devises) should have been the controlling testamentary scheme for probate of the residuary estate.

### August 25, 1992, Will ("August 1992 Will")

This will included specific bequests to the medical school of Northwestern University in the amount of $500,000, Ms. Rocke in the amount of $400,000, and Mr. Tornwall, Mr. Carey, and Ms. DuBois in the amount of $100,000 each, but the residuary of the estate was now divided into equal thirds between Mr. Tornwall, Mr. Carey, and Ms. DuBois.

*January 29, 1993, Will ("1993 Will")*

The 1993 will contained specific bequests to Northwestern University's medical school in the amount of $500,000, Ms. Rocke in the amount of $400,000, Ms. DuBois in the amount of $150,000, and Mr. Tornwall and Mr. Carey in the amount of $100,000 each. The residuary of the estate was devised in equal thirds between Mr. Tornwall, Mr. Carey, and Ms. DuBois.

*1994 Will*

This will, like the 1993 will, included specific bequests to Northwestern University's medical school in the amount of $500,000, Ms. Rocke in the amount of $400,000, Ms. DuBois in the amount of $150,000, and Mr. Tornwall and Mr. Carey in the amount of $100,000 each. The residuary of the estate was again devised in equal thirds between Mr. Tornwall, Mr. Carey, and Ms. DuBois.

In addition to these testamentary documents, the probate court also considered the testimony of Mr. Carey, Ms. DuBois, Ms. Rocke, and other witnesses who had been involved with Mrs. Murphy's estate planning. By nearly all accounts, Mrs. Murphy maintained few personal relationships in the final decades of her life; she never knew anyone in her extended family other than Ms. Rocke, with whom she had enjoyed a close, social relationship since the early 1960s. Over time, Mr. Carey and Ms. DuBois built their own relationship with Mrs. Murphy (Ms. DuBois would eventually manage Mrs. Murphy's day-to-day finances for several years) founded upon Mr. Carey's service as her counsel. While Mrs. Murphy's health and mental awareness diminished, Mr. Carey and Ms. DuBois' share of the estate grew under the wills Mr. Carey drafted.

After the conclusion of the trial, on August 1, 2008, the probate court entered its Order on Objection to Petition for Administration and Order Admitting Will to Probate ("Order on Objection").  The Order on Objection included thorough and detailed findings that Mr. Carey and Ms. DuBois had, in fact, exerted undue influence through their confidential, fiduciary, and personal relationships with Ms. Murphy in order to become residuary devisees of her estate.[2]  The probate court further concluded that the residuary devises in the 1994 will were void but that "[t]he remainder of the provisions of the will are valid and shall control the disposition of the assets specifically devised."  The court then admitted the 1994 will to probate, excluding its residuary devises, and ordered that "the rest, residue and remainder [of the estate] shall pass by the laws of intestate succession" as a lapsed gift.

Implicit in the probate court's determination was that the 1994 will's revocation clause, revoking all of Mrs. Murphy's prior wills, remained valid, so that the vast majority of Mrs. Murphy's estate would now pass to her intestate heirs who were, as yet, still unknown.  Suffice it to say, none of the litigants were particularly satisfied with that result.

---

[2]We need not recount all of the probate court's findings of undue influence—which were quite extensive—but would echo the court's sense of puzzlement as to why Mr. Carey, an esteemed lawyer and a former city councilman, FBI agent, and Army Air Corps veteran, succumbed to the temptation to pursue a pecuniary windfall at the expense of a frail and susceptible client.  Sadly, the pall of this case cast a long shadow over an otherwise exemplary professional reputation.  Cf. Fla. R. Prof. Conduct 4-1.8(c) ("A lawyer shall not . . . prepare on behalf of a client an instrument giving the lawyer . . . any substantial gift unless the lawyer . . . is related to the client.").  We make this observation not to impugn the memory of Mr. Carey, who passed away in 2014, but to state this simple point: the repercussions from a single ethical lapse may carry far beyond a lawyer's license to practice law.

B.

Mr. Carey and Ms. DuBois appealed the Order on Objection, and Ms. Rocke filed a cross-appeal, arguing that the probate court should have effectuated her residuary devise in the February 1992 will under the doctrine of dependent relative revocation. In Carey v. Rocke, 18 So. 3d 1266 (Fla. 2d DCA 2009), this court affirmed the probate court's determinations in every regard, except its decision to administer the residue of Mrs. Murphy's estate through intestacy. As to the residuary disposition, we pointed the probate court's attention to the doctrine of dependent relative revocation, citing the Fifth District's decision in Wehrheim v. Golden Pond Assisted Living Facility, 905 So. 2d 1002 (Fla. 5th DCA 2005). We noted that we could not determine whether the doctrine's presumption applied based on the record then before us and that "the decision as to whether the residuary clause in one of Mrs. Murphy's prior wills is enforceable necessarily requires factual determinations in this case." Rocke, 18 So. 3d at 1267. We then remanded the case to the probate court for further proceedings to make those factual determinations. Id.

Unfortunately, the proceedings on remand appear to have taken a somewhat unusual turn. Rather than convene an evidentiary hearing, the probate court, apparently proceeding under the mistaken assumption that it had only been asked to clarify whether it had considered the doctrine of dependent relative revocation, entered an Order on Remand dated March 12, 2010. Relying solely on the wills that had been admitted at the prior trial, and without identifying the potential intestate heirs, the probate court concluded that the doctrine of dependent relative revocation did not apply.

- 7 -

In its order, the probate court briefly traced the history of the doctrine of dependent relative revocation and provided its view of various cases and law review articles interpreting the doctrine. But the court felt bound to discern Mrs. Murphy's intent solely from the testamentary instruments and without consideration of extrinsic evidence such as the testimony from the prior trial, a task which, it allowed, presented a difficult challenge. The probate court determined that the doctrine was not applicable because of what it deemed "dramatic" changes between the residuary devises throughout Mrs. Murphy's last six wills and the lack of evidence either that "the decedent's intent to revoke her preceding wills was equivocal or conditional" or that she intended to revive any prior will by republication. The probate court clarified its previous finding, concluding that the undue influence that permeated the residuary clause of the 1994 will had not tainted that will's revocation clause. It then observed that "the inference that decedent would have preferred probate of the residuary clause in the February 1992 Will over intestacy is purely speculative." Finally, the probate court opined that "to adopt any of the five residuary clauses [from the prior wills], all unreflective of the testator's intent, would require this court to speculatively re-draft [sic] the testatrix's will." The court again ordered that Mrs. Murphy's residuary estate should pass through intestacy.

It would take another four years before the probate court was able to effectuate that ruling and render a final order disposing of Mrs. Murphy's estate. The delay was likely attributable to the task of tracing all of Mrs. Murphy's ancestry. Eventually, an heir search firm identified and located forty-eight heirs through Mrs. Murphy's deceased grandparents. Most of these heirs were spread across the United

States and, apparently, were completely unaware of their familial connection to Mrs. Murphy. With this information, but still without convening an evidentiary hearing, the probate court entered a Final Order Determining Beneficiaries and Respective Shares on July 28, 2014, implementing an intestate succession plan pursuant to section 732.103, Florida Statutes (2006). Ms. Rocke then initiated this appeal.

## II.

The issues in this appeal present mixed questions of law and fact. The application of an evidentiary presumption such as the doctrine of dependent relative revocation is an issue of law subject to a de novo standard of review. Universal Ins. Co. of N. Am. v. Warfel, 82 So. 3d 47, 57 (Fla. 2012). Whether or to what extent the predicate facts giving rise to a legal presumption or its rebuttal were established is an issue of fact, which we review for competent, substantial evidence. Conahan v. State, 118 So. 3d 718, 727 (Fla. 2013).

## III.

We begin by examining the legal construct at the heart of this appeal, the doctrine of dependent relative revocation. Founded in the common law of early eighteenth century England, the doctrine was first adopted by the Florida Supreme Court, which explained:

> This doctrine has been stated and reiterated by many courts since it was first expounded in 1717, but stated simply it means that where [a] testator makes a new will revoking a former valid one, and it later appears that the new one is invalid, the old will may be re-established on the ground that the revocation was dependent upon the validity of the new one, [the] testator preferring the old will to intestacy.

Stewart v. Johnson, 194 So. 869, 870 (Fla. 1940). Grounded in the axiom of probate

- 9 -

law that intestacy should be avoided whenever possible,[3] the doctrine of dependent relative revocation, our court has observed, is "a rule of presumed intention" that creates a rebuttable presumption that the testator would have preferred to have a prior will effectuated over statutory intestacy. In re Lubbe's Estate, 142 So. 2d 130, 134 (Fla. 2d DCA 1962), overruled on other grounds by In re Johnson's Estate, 359 So. 2d 425 (Fla. 1978). The presumption's application hinges on whether "the provisions of the present invalid will are sufficiently similar to the former will." Wehrheim, 905 So. 2d at 1008 (citing Stewart, 194 So. at 871-72); see also Lubbe, 142 So. 2d at 135 ("The proper application of the doctrine depends upon a sufficient showing that the provisions of the invalid will are not materially different from the prior will and that the testator must have intended to revoke his prior will only if his new will were valid."). In cases of undue influence, if a prior will is sufficiently similar to an invalidated will then the presumption arises but may be rebutted by evidence that "the revocation clause was not invalidated by undue influence and that it was not intended by the decedent to be conditional on the validity of the testamentary provisions" of the will. Wehrheim, 905 So. 2d at 1009-10; cf. § 732.5165 (stating any part of a will procured by fraud, duress, mistake or undue influence is void, "but the remainder of the will not so procured shall be valid if it is not invalid for other reasons").

---

[3]See, e.g., In re Gregory's Estate, 70 So. 2d 903, 907 (Fla. 1954) ("If the terms of a will are such as to permit two constructions, one of which results in intestacy and the other of which leads to a valid testamentary disposition, the construction is preferred which will prevent intestacy."); Dutcher v. Estate of Dutcher, 437 So. 2d 788, 789 (Fla. 2d DCA 1983) ("Intestacy is not favored over a disposition under a will where construction of the will leads to a valid testamentary disposition."); In re Mullin's Estate, 133 So. 2d 468, 471 (Fla. 2d DCA 1961) ("A construction which results in partial intestacy should not be used unless it clearly appears that such was intended."); In re Estate of Baer, 446 So. 2d 1128, 1128 (Fla. 4th DCA 1984) ("[T]he law abhors intestacy.").

With this framework, then, the proper analysis in this case on remand should have proceeded along the following sequence: (i) did Ms. Rocke establish sufficient similarity between Mrs. Murphy's wills that would have given rise to the doctrine of dependent relative revocation; (ii) if so, were there sufficient record facts to overcome that presumption so that the 1994 will's revocation clause could withstand; and (iii) if not, if the presumption remained intact, which, if any, will or residuary devise in Mrs. Murphy's prior wills reflected her true testamentary intention?  It appears to us that the probate court focused too closely on this third analytical step to the point of conflating it with the first two.  That was error.  We must examine each step in its proper turn.

A.

In order to give rise to the presumption that the 1994 will's revocation clause was conditioned upon the validity of its testamentary devises, Ms. Rocke had to establish that Mrs. Murphy's prior, revoked wills were "sufficiently similar" to the 1994 will.  See Wehrheim, 905 So. 2d at 1008.  Ms. Rocke argues that when viewed broadly and without regard to the devises to Mr. Carey and Ms. DuBois, the overall dispositional plan of the wills remained fairly constant.  She also points to the execution of so many wills over the years, which, Ms. Rocke posits, was proof of Mrs. Murphy's preference to leave her property through testacy.  Finally, Ms. Rocke contends that the extrinsic evidence presented to the probate court lent further proof that the revocation clause in the 1994 will was also the product of Mr. Carey and Ms. DuBois' undue influence and that Mrs. Murphy would have never intended to leave the bulk of her estate to a collection of individuals she had never met or known.  The appellees disagree that there

- 11 -

was any similarity between the wills, focusing on the fact that Ms. Rocke was only a residuary devisee in two of Mrs. Murphy's last six wills and that the bequests and devises to Ms. Rocke varied from will to will. Furthermore, according to the appellees, the probate court was precluded from considering any extrinsic evidence apart from the testamentary documents themselves in deciding whether Mrs. Murphy's wills were sufficiently similar to implicate the doctrine of dependent relative revocation.

The discrete point of contention here is one of measurement. Somewhere in the conceptual space between "identical" and "antithetical" resides "similar," and the parties disagree where its boundaries should be marked for this kind of case. One could draw the notion of sufficient similarity between wills broadly or narrowly. Florida courts have seldom expounded upon the issue,[4] but in the context of undue influence we would incline toward a broader definition of similarity, one that takes into account the testamentary instruments themselves and any admissible evidence that may be relevant. We do so for several reasons.

1.

Unlike cases where a will has been invalidated for an impropriety with its execution, see Lubbe, 142 So. 2d 130 (interested beneficiary acted as witness), or a legal impediment exists that precludes the execution of a testator's wishes, see In re Pratt's Estate, 88 So. 2d 499 (Fla. 1956) (charitable residuary devise violated Florida's now-repealed Mortmain statute)—cases where there is no serious question about the testator's intent (only the legal efficacy of his or her testamentary documents)—in cases

---

[4]Cf. Rosoff v. Harding, 901 So. 2d 1006, 1008-09 (Fla. 4th DCA 2005) ("Although centuries old, few Florida cases have applied the doctrine of dependent relative revocation.").

of undue influence, the decedent's intent has been impaired, destroyed, or overridden by someone else.  See RBC Ministries v. Tompkins, 974 So. 2d 569, 571 (Fla. 2d DCA 2008).  The undue influence effectively grafts a different disposition or scheme into a testamentary instrument than would have otherwise been created.  Cf. Peacock v. DuBois, 105 So. 321, 322 (Fla. 1925) ("The rule seems to be well settled that undue influence justifying the setting aside of will, deed, or other contract must be such as to dethrone the free agency of the person making it and rendering his act the product of the will of another instead of his own.").  Keeping in mind that the requirement of sufficient similarity serves to ensure the indicia of the testator's intent, any construction of similarity must necessarily account for the intrusion of another's intentions in cases of undue influence.  A broad construction of similarity does so.

We also find support for a broad construction of the doctrine's similarity requirement from the Fifth District's decision in Wehrheim.  In Wehrheim, a decedent's last will submitted to probate named her assisted living facility as the primary beneficiary of her estate.  905 So. 2d at 1006.  The decedent's children initiated adversary proceedings, alleging undue influence on the part of the facility.  Id.  In response, the facility argued that under the doctrine of dependent relative revocation the children would have no standing to challenge the will because none of them were named as beneficiaries within any of the decedent's prior three wills.  Id.  While reversing the trial court's summary judgment in favor of the facility, the Fifth District rejected the children's argument that the doctrine of dependent relative revocation could not apply because the prior wills were not sufficiently similar to one another.  Id. at 1009.  The Wehrheim court offered this analysis of the similarity between the instruments:

The Wehrheims contend that the 2002 will is not sufficiently similar to the prior wills because the decedent had never before made a charitable devise of her estate. . . . While the charitable devise may be a difference between the 2002 will and the prior wills, we discern a very significant similarity among all of the decedent's wills, which is her intention not to devise any portion of her estate to her children. Based on this similarity, we are unable to say that the presumed preference of the decedent for her prior dispositions and for testacy over intestacy has been rebutted.

Id. at 1008.

In its comparison, the Wehrheim court gave passing consideration to the specific beneficiaries in any of the wills at issue. Rather, the court found sufficient similarity for the doctrine's application simply from noting who was *not* a beneficiary under any of the wills. The absence of the decedent's children was enough of a common thread to construe a similar testamentary intent between all of the decedent's wills. We agree with the Fifth District's broad conception of similarity for cases involving undue influence, as it furthers the doctrine of dependent relative revocation's underlying purpose of promoting testacy over intestacy whenever possible. See In re Gregory's Estate, 70 So. 2d 903, 907 (Fla. 1954); Dutcher v. Estate of Dutcher, 437 So. 2d 788, 789 (Fla. 2d DCA 1983); In re Estate of Baer, 446 So. 2d 1128, 1128 (Fla. 4th DCA 1984); cf. In re Estate of Dunson, 141 So. 2d 601, 604 (Fla. 2d DCA 1962) ("The right to dispose of one's property through the instrumentality of a will is highly valuable, and it is the policy of the law to hold a will good wherever possible."). Indeed, to hold otherwise, to apply an overly strict or narrow construction of similarity, would likely consign the doctrine of dependent relative revocation to a minute corner of irrelevance for cases of undue influence. We see no reason to corral the presumption for this class of cases.

- 14 -

2.

But we must part company with the Fifth District insofar as <u>Wehrheim</u> would preclude a probate court from considering extrinsic evidence when deciding the doctrine's applicability in claims involving undue influence. <u>Wehrheim</u>, 905 So. 2d at 1008 (noting that a court "must confine its inquiry to the testamentary documents before it without resort to extrinsic evidence"). In determining whether testamentary instruments are sufficiently similar for purposes of the doctrine of dependent relative revocation, a court should always look first to the documents themselves. <u>Brickell v. DiPietro</u>, 198 So. 806, 810-11 (Fla. 1940) ("It is the duty of the court to give effect to the intention of the testator where it can be ascertained and determined from the four corners of the will."). However, in cases of undue influence, its analysis cannot simply end there.

Extrinsic evidence may be essential in order to grasp the true testamentary intentions of a testator who has left multiple wills, some of which may or may not have been affected, to some degree, by another's undue influence. <u>Cf.</u> <u>Marshall v. Hewett</u>, 24 So. 2d 1, 2 (Fla. 1945) (noting that where a will's expressions are difficult to reconcile, "then the situation of the testator at the time he made his will, the ties that bound him to the objects of his beneficence, the motives that prompted him to make the will he did make, and the influences that wrought on him at the time, will be considered in arriving at the purpose of the testator"); <u>In re Dickson's Estate</u>, 590 So. 2d 471, 473 (Fla. 3d DCA 1991) ("Whenever the question is raised as to whether or not there has been a revocation by any destruction or obliteration, parol and other extrinsic evidence is necessarily admissible to show what acts were done by the testator and

- 15 -

what his intentions were." (quoting Leighton v. Harmon, 111 So. 2d 697, 700 (Fla. 2d DCA 1959))). Without resort to extrinsic evidence, a proponent for the doctrine's presumption may have no viable means of showing sufficient similarity between the tainted and untainted portions of testamentary documents and an adverse party would never have a way to rebut the presumption. Cf. In re Lubbe's Estate, 142 So. 2d at 135 ("In the absence *of evidence overcoming the presumption*, the prior will may be admitted to probate if its contents can be ascertained." (emphasis supplied)).

Furthermore, we believe the Fifth District's rule misconstrues Florida precedents on this evidentiary point. In its mention of an extrinsic evidence bar, the Wehrheim court cited the Florida Supreme Court's decision in In re Pratt's Estate, 88 So. 2d 499, and the First District's case of In re Barker's Estate, 448 So. 2d 28 (Fla. 1st DCA 1984). Neither of those cases involved a claim of undue influence.[5] The Barker court's application of the evidentiary prohibition stemmed from the fact that the extrinsic evidence (an attorney's affidavit) purported to cast doubt on whether the testator had meant to sign a particular version of a will, which was the threshold issue of the will contest in that case. 448 So. 2d at 29. In Pratt, 88 So. 2d at 503, the Florida Supreme Court seemed to imply that extrinsic evidence might, in fact, be categorically appropriate for cases of undue influence:

> The case before us is one wherein the testator, by an unambiguous, complete testamentary instrument, has disposed of all of his property, expressly revoking all prior wills. *There is no suggestion of fraud or undue influence.* There are no conflicting provisions of testamentary papers *necessarily before the court*, as in the case of a will and

---

[5]We have found no other published decision in which any state's court has barred consideration of extrinsic evidence when confronted with the question of whether the doctrine of dependent relative revocation should apply in a case of undue influence.

- 16 -

> codicils, which might form a basis for the admission of parol
> evidence for its bearing upon the testamentary intent.

(First emphasis supplied); see also Stewart, 194 So. at 871 ("But the material inquiry in

all cases is, whether the destruction of the will was animo revocandi, and to determine

this it is necessary to consider the circumstances under which and the purposes and

reasons for which it was destroyed; and where from all the circumstances in evidence it

appears that the destruction or revocation was connected with, or because of, the

execution of another will, and that the testator meant the revocation of the one to

depend upon the validity of the other . . . .").

We find no reason to erect a barrier between admissible evidence and the

task of sifting similarities between wills that have been affected by undue influence.

Rather, we join the courts of our sister states to hold that, in cases involving undue

influence, a probate court is not confined to the testamentary documents when

determining whether the doctrine of dependent relative revocation should apply. See

Estate of Anderson, 56 Cal. App. 4th 235, 247-49 (Cal. Ct. App. 1997) (observing that

questions of ambiguity or revocation of a will permit consideration of extrinsic evidence;

"[a]pplying these principles, we conclude that extrinsic evidence may be considered in

determining whether Anderson conditioned the revocation of the first will on the exercise

of the power of appointment in De Paul's favor" (citing In re Kaufman's Estate, 155 P.2d

831 (Cal. 1945))); In re Estate of Anthony, 121 N.W. 2d 772, 779 (Minn. 1963)

(remanding case to district court "to receive whatever extrinsic evidence of the testator's

intention may be available").  Upon a finding of undue influence, a probate court may

consider any relevant, admissible evidence to decide if the testator intended a will's

revocation clause to be conditional upon the will's efficacy.

3.

Comparing Mrs. Murphy's wills in the appropriately broad light, and in the light of all the evidence, we find there were sufficient similarities between Mrs. Murphy's 1994 will and her prior wills to support the application of the doctrine of dependent relative revocation to the 1994 will. We discern several contours of similarity that were unrefuted in the record.

First, Mrs. Murphy's execution of six wills over a period of five years evidences a sustained concern about the disposition of her property upon her death. Mrs. Murphy prized her right to dictate how her property should be divided, and she exercised that right, repeatedly, in the final years of her life. No one seriously disputes that she preferred testacy over intestacy. And that is, of course, the very foundation for the doctrine of dependent relative revocation's application. See Stewart, 194 So. at 870.

Moreover, the testamentary documents themselves evince an overall pattern of similarity. Each of Mrs. Murphy's wills employed a similar testamentary scheme in which Mrs. Murphy made numerous specific bequests to charities and caregivers while limiting the division of the residuary of her estate to a few devisees. Although their respective proportions varied from will to will, the identities of the devisees and beneficiaries within the six wills, overall, remained fairly constant. Indeed, in its Order on Remand, the probate court observed, "Over the course of six wills, the changes in specific bequests were insubstantial." The variance the probate court fixed upon, the alteration of residuary devisees, is likewise modest once the effect of Mr. Carey and Ms. DuBois' undue influence is properly taken into account. When Mr. Carey

- 18 -

and Ms. DuBois are removed from consideration, there is only one change between the six wills' residuary clauses that did not involve Mr. Carey or Ms. DuBois' illicit gain over the residuary estate: the change between the 1989 will and the 1991 will, which exchanged Northwestern University's medical school and Ms. Rocke's respective positions as a specific beneficiary and a residuary devisee. For her part, Ms. Rocke appeared repeatedly throughout Mrs. Murphy's wills, either as a residuary devisee, a designee of a specific bequest, or both.

Finally, the extrinsic evidence proffered before the probate court further demonstrated the appropriateness of applying the presumption in this case. With the exception of four individuals, including Ms. Rocke, none of the forty-eight intestate heirs ultimately identified in the Final Order Determining Beneficiaries and Respective Shares were mentioned within any of Mrs. Murphy's six wills. In contrast to the close relationship she had with Ms. Rocke, it appears Mrs. Murphy never knew her intestate heirs, and they never knew her. The intestate heirs' ancestral ties to Mrs. Murphy apparently remained forgotten until this litigation (and an heir search firm) brought them to light. Intestacy, in this case, would usurp the repeated testamentary dispositions of Mrs. Murphy's property throughout her wills, dispositions that were invariably tied to individuals she cared about or charities and institutions which she supported. Cf. In re Jones' Estate, 352 So. 2d 1182 (Fla. 2d DCA 1977) (applying doctrine because testator's wills demonstrated a strong aversion to intestacy by their expressed intention to disinherit the decedent's daughter). We hold, as a matter of law, that Mrs. Murphy's six wills were sufficiently similar to give rise to the doctrine of dependent relative revocation's presumption.

B.

Having determined that the doctrine of dependent relative revocation should have been applied to the 1994 will, we next consider whether there were sufficient facts to rebut the doctrine's presumption. Before answering this query, we pause to explain briefly what this presumption, and its rebuttal, would entail in a case such as this.

The Florida Evidence Code codifies the application of legal presumptions for civil actions in Florida. See Warfel, 82 So. 3d at 53. Specifically, section 90.301(1), Florida Statutes (2006), defines a presumption as "an assumption of fact which the law makes from the existence of another fact or group of facts found or otherwise established." The Florida Statutes describe two potential classifications of rebuttable presumptions as follows:

> Every rebuttable presumption is either:
>
> (1) A presumption affecting the burden of producing evidence and requiring the trier of fact to assume the existence of the presumed fact, unless credible evidence sufficient to sustain a finding of the nonexistence of the presumed fact is introduced, in which event, the existence or nonexistence of the presumed fact shall be determined from the evidence without regard to the presumption; or
>
> (2) A presumption affecting the burden of proof that imposes upon the party against whom it operates the burden of proof concerning the nonexistence of the presumed fact.

§ 90.302.

> In a civil action or proceeding, unless otherwise provided by statute, a presumption established primarily to facilitate the determination of the particular action in which the presumption is applied, rather than to implement public policy, is a presumption affecting the burden of producing evidence.

- 20 -

§ 90.303.

The Florida Probate Code clarifies that presumptions arising from undue influence "implement public policy" that justify shifting the entire burden of proof when a presumption arises. § 733.107(2), Fla. Stat. (2014) ("In any transaction or event to which the presumption of undue influence applies, the presumption implements public policy against abuse of fiduciary or confidential relationships and is therefore a presumption shifting the burden of proof under ss. 90.301-90.304."); see also Hack v. Janes, 878 So. 2d 440, 443 (Fla. 5th DCA 2004) ("The 2002 amendment to section 733.107, adding subsection 2, was intended to incorporate sections 90.301-90.304 of the Florida Evidence Code, and require a shifting of the burden of proof after the presumption of undue influence arises in a will contest."). Thus, the doctrine of dependent relative revocation, when applied in a case of undue influence, shifts the burden of proof to the parties opposing its application.

It was incumbent, then, upon any party opposing the presumption to prove that the 1994 will's revocation clause was untainted by the same undue influence that infected its residuary clause and that Mrs. Murphy held an independent, untainted intention to revoke all of her prior wills at the time she executed the 1994 will so that the bulk of her estate would pass by intestacy. See Wehrheim, 905 So. 2d at 1009-10 (noting the "daunting task" of refuting the doctrine's presumption in a case where undue influence had been established). No such showing was ever made here. This will's revocation clause, an otherwise unremarkable example of boilerplate testamentary language, contains no statement of an intent to sever its application from the rest of the will. Nor did the probate court elucidate any independent, factual basis to support its

- 21 -

conclusion that the undue influence that permeated the residuary clause of the 1994 will somehow left its revocation clause untouched. Our review of the record has found no evidence that would support such a counterintuitive conclusion. Quite the contrary, the presumption appears particularly apt in this case, as one of the individuals found to have unduly influenced Mrs. Murphy, Jack Carey, drafted both the residuary clause and the revocation clause of the 1994 will and stood to gain from both of those clauses' execution.

The presumption that arose from the doctrine of dependent relative revocation was never rebutted in the proceedings below. The revocation clause within the 1994 will should, therefore, have been deemed invalid, as it was dependent upon the effectiveness of that will's invalid residuary clause.

### C.

Stripping the undue influence that spanned the residuary devises of Mrs. Murphy's last six wills leaves two alternative residuary devises that remained untainted: the medical school of Northwestern University or Ms. Rocke. Northwestern University would receive the entire residuary of Mrs. Murphy's estate under the express provision of the 1989 will. Ms. Rocke would stand to receive all of the residuary estate by operation of law under the February 1992 will as the only remaining residuary devisee in that will. See § 732.5165 (establishing that any part of a will procured by undue influence is void, "but the remainder of the will not so procured shall be valid if it is not invalid for other reasons"). The question then becomes which devise from which will should determine the disposition of the residuary estate.

From our review of the evidence proffered below,[6] the February 1992 will's residuary clause, which includes the last untainted residuary disposition Mrs. Murphy made, controls the disposition of her residuary estate. See § 732.5165. Although it is true Mr. Carey and Ms. DuBois procured part of the February 1992 will's residuary clause through their illicit efforts, the probate court made no finding—as, indeed, no one has ever argued—that Ms. Rocke was, in any way, associated with that exertion of undue influence over Mrs. Murphy. The February 1992 will would remain perfectly intelligible and true to Mrs. Murphy's repeated indications of preferring testacy over intestacy had the probate court excised Mr. Carey and Ms. DuBois' devises and left Ms. Rocke's to stand. See In re Van Horn's Estate, 305 So. 2d 46 (Fla. 3d DCA 1974) (affirming devise of entire residue of estate to testator's nephew after testator's guardian was stricken as a residuary devisee where no connection was ever shown between the nephew and the guardian's exercise of undue influence over the testator); see also In re Kiggins' Estate, 67 So. 2d 915, 918 (Fla. 1953) (concluding that where one residuary devisee exerted undue influence over the decedent but there was "no evidence whatever in the record to show that [the remaining devisees] at any time were guilty of any misconduct toward the deceased" their devises were properly upheld). The court must honor the last uninfluenced residuary devise Mrs. Murphy made: to her cousin,

_____

[6]The parties have argued the issue of the doctrine of dependent relative revocation extensively and repeatedly before the probate court; and notwithstanding the court's refusal to consider it, they have proffered a substantial amount of testimony and evidence into the record below. Lest this lawsuit devolve into a Dickensian epic, we will not delay a final decision about Mrs. Murphy's estate any longer. Cf. J. Sourini Painting, Inc. v. Johnson Paints, Inc., 809 So. 2d 95, 98 (Fla. 2d DCA 2002) ("Litigants, and the public generally, have a right to expect that controversies between parties respecting their rights and liabilities should be expeditiously resolved in our judicial system.").

Jackie Rocke.

IV.

In conclusion, we hold that in cases of undue influence over a testator, the presumption from the doctrine of dependent relative revocation requires only a showing of broad similarity between a decedent's testamentary instruments. We further hold that a probate court may consider any admissible extrinsic evidence when measuring similarity for purposes of the doctrine's application. Consistent with sections 90.302(2) and 733.107(2), we hold that when the doctrine's presumption arises the burden of proof then shifts to the opponent of the presumption to show that the testator held an independent, unaffected intention to revoke the otherwise affected will.

Having clarified the doctrine's application, we find that the presumption under the doctrine was established here and was not rebutted. The probate court erred and should have admitted the February 1992 will to probate with Ms. Rocke receiving the residuary of the estate as the last remaining devisee. Accordingly, we reverse the order of the probate court and remand with directions to enter an order consistent with this opinion. We certify conflict with Wehrheim v. Golden Pond Assisted Living Facility, 905 So. 2d 1002, 1008 (Fla. 5th DCA 2005), as discussed in section III(A)(2) of our opinion.

Reversed and remanded; conflict certified.

VILLANTI, C.J., and KELLY, J., Concur.