LUCAS, Judge.
We have before us an inheritance dispute that poses the question of whether a couple was ever lawfully married under Israeli law. The probate court concluded that Mali Ben Shushan and the late Ye-hezkel Cohen were in a recognized legal *1115 union in Israel at the time of Mr. Cohen’s passing; thus, according to the court, under section 732.102, Florida Statutes (2013), Ms. Shushan was entitled to a surviving spouse’s share of Mr. Cohen’s intestate estate. Diana Cohen, Mr. Cohen’s daughter, now appeals the probate court’s order. Recognizing the deference we must afford to a sovereign nation’s authority to define, for its own people, the unique status of marriage, we conclude that the probate court erroneously conflated a domestic union under Israeli law with marriage under Israeli law.
I.
The facts in this case were essentially undisputed. While living in Israel, Mr. Cohen and Tami Rana were married in a religious ceremony on September 2, 1981. The couple had two children, Diana and Michael Cohen. Following their separation, Ms. Rana moved with the children to Florida, and in 1985, she and Mr. Cohen were divorced.[1]
A few years later, Mr. Cohen formed a romantic—and, by all accounts, enduring— relationship with Ms. Shushan. Beginning in 1990, Mr. Cohen and Ms. Shushan lived together as a couple in Israel and remained together until Mr. Cohen’s passing in 2013. Ms. Shushan and Mr. Cohen had four children together, ran Israeli businesses together as partners, and unwaveringly held themselves out as husband and wife to their friends and family. To all appearances, they would have seemed a married couple, and indeed, they may very well have thought themselves to be each other’s spouse. But critically, Ms. Shushan and Mr. Cohen never participated in a religious wedding through any religious authority recognized under Israeli law.
After her father’s death, Diana Cohen filed a petition for intestate administration of Mr. Cohen’s Florida assets, naming Mr. Cohen’s six children as the only intestate heirs. Ms. Shushan responded that under Israeli law, she should be considered the decedent’s wife for purposes of inheritance and entitled to a surviving spouse’s share of this property. According to Ms. Shush-an, she was a “common law spouse” of Mr. Cohen at the time of his passing, a legally recognized relationship in Israel, which, she argued, was the functional equivalent of marriage. Ms. Cohen did not dispute that Ms. Shushan was indeed her late father’s “reputed spouse” in Israel,[2] but, she argued, that legal status was not one the Israeli state recognizes as marriage. Because Israel’s law limits marriage to a union formed under the auspices of a recognized religious authority, Ms. Shushan was never Mr. Cohen’s married spouse, according to Ms. Cohen.
This discrete point of legal interpretation—what is a reputed spouse—became the focal point of the two-day trial held before the probate court in March 2015. Ms. Cohen and Ms. Shushan each called an Israeli family law attorney to provide expert testimony on the subject of reputed spouses under Israel’s family law. The experts did not recite the precise code or *1116 statutory provision from which they drew their respective opinions, nor did the parties proffer an interpretation of an Israeli legal text for the probate court’s consideration; rather, the testifying attorneys each opined as to the general state of Israel’s domestic relations law, how that law has evolved over time, and what the status of a reputed spouse entails under Israeli law. On those points, their opinions were entirely consonant.
Ms. Shushan’s expert, Ruth Dyan, testified that reputed spouses enjoy many benefits under Israel’s law, including succession or inheritance rights, social security benefits, and financial support and property distribution should the couple separate, all of which, she remarked, are “exactly as a married couple.” She observed that a couple need only live together under the same roof and share a life and future together in order to establish a reputed spousal relationship. And she confirmed that Ms. Shushan and Mr. Cohen had satisfied the law’s elements to establish a reputed spouse relationship in Israel. Ms. Dyan emphasized that “the Israeli State recognizes common law spouse as equal to marriage,” but she was very clear in her testimony that the two relationships—marriage and reputed spouses—remained distinct under Israel’s law: “[I] have to explain, in Israel, we don’t have the common law marriage because under the Israeli law only religious marriage is recognized ...” (Emphasis added.) Referring to Ms. Cohen’s expert’s opinion summary, which described the legal relationship as that of a reputed spouse, she clarified, and emphasized, this point even further:
I think we use different phrases to describe the same situation, because we didn’t allege that there is common law marriage under the Israeli law, but the common law spouse is exactly like common law marriage in the United States, and Known in Public is translated from Hebrew. It doesn’t have any meaning in English, as far as I know.
... Known in public is a translation from the Hebrew phrase which means common law spouse, and if I can say that the difference between your world and ours is unbelievable, because in Israel the religious law does everything in divorce and in family court.
So we don’t have—we cannot have common law marriage. If I want to marry my spouse not under the religious law, I am not entitled to ....
[[Image here]]
We do not marry in a civil way. So we live together and the State recognizes, gives us all the rights, and many, many years of legislation in Israel is common law spouse and now, in this date, if somebody comes to me and asks me if it is better to be married, if a married woman has more right, I tell her no.
Common law spouse has the same right as married woman in Israel. It is very different than a way you cannot understand it, but this is our situation in Israel, for the Jewish people anyway.
(Emphasis added.)
Amir Tytunovich testified as an expert for Ms. Cohen. His opinion echoed Ms. Dyan’s with respect to the distinction between married spouses and reputed spouses under Israeli law:
Q. In Israel, what is a reputed spouse?
A. A reputed spouse—in Israel, when we translate the words from Hebrew, it is Known in Public. Reputed spouse is about the same thing. It means that a man and a woman are living together, sharing a house, and seem to act as if they are married, but they are not.
Q. Does Israel recognize a reputed spouse arrangement as a marriage?
*1117 A. No, it has nothing to do with marriage. The answer is no.
Q. Does Israel recognize common law marriages?
A. No, in Israel there is only one kind of marriage, and those are the religious marriages by the religious authorities. There is no other way to get married in Israel other than religious marriage. ...
Mr. Tytunovich added that reputed spouses need not formally divorce if they ever separate: “Since they are not married, they can separate whenever they like. They don’t have to get divorced.”
After hearing legal arguments from counsel, the probate court entered its Order Determining Beneficiaries on September 11, 2015, in which it determined that Ms. Shushan was the late Mr. Cohen’s surviving spouse under section 731.102. In its examination of Israeli law, the probate court’s order provided a thorough consideration of the historic development and scholarly commentary surrounding the reputed spousal relationship in Israel. Drawing societal concerns together with the array of rights the reputed spouse relationship provides, the probate court concluded:
This [c]ourt finds the arrangement of Israeli reputed spouses to exceed that of mere circumstance. For many spouses, it is a conscious choice that represents a desire to eschew the trappings of religious marriage. For others, it is a still conscious choice, but one that represents a desire to have a committed relationship despite rabbinical restrictions. ... However, the State of Israel has no civil marriage institution, but has enacted laws regarding the rights of reputed spouses that are as comprehensive as the rights of religiously married spouses.
Accordingly, this [e]ourt finds Israeli reputed spouses to be “a legal union between one man and one woman as husband and wife.” Because Florida will recognize marriages from other jurisdictions and because a marriage is simply a “legal union,” this [c]ourt finds that Mali [Shushan], the reputed spouse of the Decedent, was engaged in a “legal union” with the Decedent within the meaning of section 741.212(3), Florida Statutes. Mali [Shushan] is therefore a surviving spouse and is entitled to take part of the intestate estate pursuant to section 732.102, Florida Statutes.
For the reasons we will explain below, that conclusion was an erroneous application of the law.
II.
At the outset, there arises something of a question about the scope of our review. Ordinarily, a lower court’s application of a foreign jurisdiction’s law is subject to de novo review on appeal, see, e.g., Kramer v. von Mitschke-Collande, 5 So.3d 689, 690 (Fla. 3d DCA 2008) (reviewing a trial court’s application of Swiss law de novo), because the court of original jurisdiction enjoys no superior vantage over the reviewing court concerning the application of law, cf. Transportes Aereos Nacionales, S.A. v. De Brenes, 625 So.2d 4, 6 (Fla. 3d DCA 1993) (noting that when reviewing a trial court’s application of foreign law de novo, “appellate courts are not limited to matters raised by the parties, but are encouraged to take an active role in ascertaining foreign law” (citing Twohy v. First Nat’l Bank of Chicago, 758 F.2d 1185, 1192 (7th Cir. 1985) (“[T]rial and appellate courts are urged to research and analyze foreign law independently.”))). Here, however, our record does not include any Israeli legal text or published decisional law to construe but rather the testimony of two experts about the meaning of Israeli marital law. Ms. Shushan suggests we categorize the probate court’s ruling from *1118 this testimony as if it were an underlying factual determination, an issue we should review for competent, substantial evidence. Cf. In re Estate of Murphy, 184 So.3d 1221, 1227 (Fla. 2d DCA 2016) (“Whether or to what extent the predicate facts giving rise to a legal presumption or its rebuttal were established is an issue of fact, which we review for competent, substantial evidence.” (citing Conahan v. State, 118 So.3d 718, 727 (Fla. 2013))). A close reading of the probate court’s order satisfies us that the court’s decision was not an evidentiary or credibility resolution between two experts’ conflicting interpretations of Israeli law. Cf. Transportes Aereos Nacionales, S.A., 625 So.2d at 6 n.2 (applying de novo review to trial court’s interpretation of the Code of Nicaragua and distinguishing the Third District’s prior decision in Guelman v. De Guelman, 453 So.2d 1159, 1160 (Fla. 3d DCA 1984), because “[i]n Guelman the correct interpretation to be given the foreign law was litigated as a question of fact”). Indeed, on the salient point of whether a reputed spouse constitutes a marriage relationship under Israeli law, there was no conflict between the opinions of these two experts. The probate court’s ruling, like the parties’ advocacy on appeal, revolves around the legal significance that ought to be drawn from a reputed spouse relationship for purposes of Florida’s intestacy law. Such a determination is, at its core, one of legal analysis applied to undisputed facts that we will review de novo. See Aills v. Boemi, 29 So.3d 1105, 1108 (Fla. 2010) (“Because this is a question of law arising from undisputed facts, the standard of review is de novo.” (citing Kirton v. Fields, 997 So.2d 349, 352 (Fla. 2008))).
III.
Section 732.102 of the Florida Statutes provides an intestate share of a Florida estate to a “surviving spouse.” The statute’s term, “spouse,” holds a plain and ordinary meaning: a spouse is a person who has entered into a marital relationship with another. See Adams v. Howerton, 673 F.2d 1036, 1040 (9th Cir. 1982) (abrogated on other grounds by Obergefell v. Hodges, — U.S.-, 135 S.Ct. 2584, 2604-05, 192 L.Ed.2d 609 (2015)) (“The term ‘spouse’ commonly refers to one of the parties in a marital relationship .... ”); Spouse, Black’s Law Dictionary (10th ed. 2014) (“One’s husband or wife by lawful marriage; a married person.”). That relationship—marriage—is one that is wholly unique in human society and has long been distinguished from any other form of domestic relationship. See, e.g., Obergefell, 135 S.Ct. at 2599 (observing that “the right to marry is fundamental because it supports a two-person union unlike any other in its importance to the committed individuals” (emphasis added)); Kerrigan v. Comm’r of Pub. Health, 289 Conn. 135, 957 A.2d 407, 418 n.15 (2008) (“The institution of marriage is unique: it is a distinct mode of association and commitment with long traditions of historical, social, and personal meaning.” (quoting R. Dworkin, Three Questions for America, N.Y. Review of Books, Sept. 21, 2006, at 24, 30)). Marriage confers a panoply of legal rights. But those rights emanate from the establishment of the marital relationship; they do not create it. See Nat’l Pride at Work, Inc. v. Governor of Mich., 274 Mich.App. 147, 732 N.W.2d 139, 150 (2007) (“Marriage triggers legal rights, responsibilities, and benefits .... ” (emphasis added)); Tostado v. Tostado, 137 Wash.App. 136, 151 P.3d 1060, 1063 (2007) (“Marriage is a personal, legal status, which is distinguishable ‘from the rights and privileges that are incidents of a marriage.’” (quoting State v. Rivera, 95 Wash.App. 961, 977 P.2d 1247 (1999))); Baehr v. Lewin, 74 Haw. 530, 645, 852 P.2d 44, 58 (1993) (“[M]arriage is a state-conferred legal status, the existence of which gives rise to rights and benefits reserved *1119 exclusively to that particular relationship.” (emphasis added)). Recognizing the societal importance and personal significance of marriage, the law strives to keep as clear as possible what the points of entry into a marital relationship are so that the public can readily discern who has entered into a marriage union and who has not. See Williams v. North Carolina, 317 U.S. 287, 298, 63 S.Ct. 207, 87 L.Ed. 279 (1942) (“Each state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders.”); see also Brian H. Bix, State of the Union: The State’s Interest in the Marital Status of Their Citizens, 55 U. Miami L. Rev. 1, 6 (Oct. 2000) (“Without an official way to designate a committed partner, the legal system would often be hard-pressed to distinguish a life-partner from an occasional, casual companion.”). The case at bar poses the discrete question of whether Ms. Shushan’s reputed spouse relationship with the decedent was a marriage.
“Florida has traditionally approved of the sanctity of marriage, and the act of marriage, regardless of where it is contracted.” Johnson v. Lincoln Square Props., Inc., 571 So.2d 541, 542 (Fla. 2d DCA 1990).[3] Thus, “[u]nder principles of comity a marriage by citizens of a foreign country, if valid under foreign law, may be treated as valid in Florida .... ” Montano v. Montano, 520 So.2d 52, 52-53 (Fla. 3d DCA 1988). Conversely, if a purported marital relationship in a foreign jurisdiction would be deemed invalid in that jurisdiction, it must be deemed invalid here. See, e.g., Betemariam v. Said, 48 So.3d 121, 125 (Fla. 4th DCA 2010) (holding that because the Commonwealth of Virginia mandated a marriage license as a condition of marriage, and the litigants had never obtained such a license, “[t]he trial court had no choice but to determine that no legal marriage had occurred”); Farah v. Farah, 16 Va.App. 329, 429 S.E.2d 626, 629 (1993) (“A marriage that is void where it was celebrated is void everywhere.” (citing Spradlin v. State Comp. Comm’r, 145 W.Va. 202, 113 S.E.2d 832, 834 (1960))), We must look, then, to the evidence presented below as to whether reputed spouses are considered married under Israeli law.
That evidence was undisputed. The State of Israehlimits marriage within its borders to religious marriages created through recognized religious authorities. Both of the experts who testified, Ms. Dyan and Mr. Tytunovich, affirmed this central point.’ And the probate court recognized in its order that “the state of Israel has no civil marriage institution.” Thus, in Israel there is one, and only one, avenue to form a marriage: through a recognized religious authority. Cf. Zvi Triger, Freedom from Religion in Israel: Civil Marriages and Cohabitation of Jews Enter the Rabbinical Courts, 27 Isr. Stud. Rev. 1, 5 (2012) (“[T]here is no formal civil marriage option in Israel. There is one commonly practiced way of avoiding the civil marriage ban (and thus the monopoly of religion over marriage), which is to get married abroad in countries that allow civil marriage for non-citizens and non-residents.”); Brett G. Scharffs and Suzanne Disparte, Comparative Models for Transitioning from Religious to Civil Marriage Systems, 12 J. L. & Fam. Stud. 409, 411 (2010) (summarizing the historic roots- of religious family law in Israel and observing that in modern Israel “[t]he laws of marriage and divorce are governed exclusively by religious law,” while “most other *1120 aspects of family law (including child custody, adoption, property and inheritance) are regulated by civil law”)- While Israel has also established the reputed spouse relationship as something of an alternative to marriage, and. indeed, has conferred a broad array of rights to reputed spouse couples that, as Ms. Dyan observed, are “equal” to marriage, Israeli law has purposely kept the status of these two relationships separate. Reputed spouses are not married spouses under Israeli law.[4]
The error within the probate court’s analysis appears to have proceeded from its attempt to apply a portion of the text of section 741.212(3), Florida Statutes (2013), Florida’s statutory prohibition against same-sex marriage, to the definitional controversy before it. Within this statute’s ban against the recognition of same-sex marriages—a ban that has effectively been ruled unconstitutional and has nothing to do with this controversy[5]—one could, with selective focus, construe a seemingly broad, even sweeping pronouncement about the kinds of relationships Florida courts must recognize as marriage: “For purposes of interpreting any state statute or rule, the term ‘marriage’ means only a legal union between one man and one woman as husband and wife, and the term ‘spouse’ applies only to a member of such a union.” § 741.212(3) (emphasis added). Reading “legal union” broadly, and employing “only” in a more colloquial sense as connoting “simply”-4he probate court, paradoxically, construed a statute originally enacted to limit Florida’s recognition of certain types of marriages, as one that requires recognition of “any legal union” whatsoever as marriage. As the probate court put it, “a marriage is simply a ‘legal union.’ ”
Such a reading was erroneous, to the extent any part of section 741.212(3) remains effective, for two reasons. First, the *1121 probate court applied only a fragment of a sentence within the statute and effectively ignored the rest of the sentence’s plain language. See Johnson v. Feder, 485 So.2d 409, 411 (Fla. 1986) (“Statutory interpretations that render statutory provisions superfluous ‘are, and should be, disfavored.’ ” (quoting Patagonia Corp. v. Ed. of Governors of the Fed. Reserve Sys., 517 F.2d 803, 813 (9th Cir. 1975))); Lewis v. City of Tampa, 64 So.3d 143, 145 (Fla. 2d DCA 2011) (“This court will not interpret statutes so as to render portions of them meaningless when a reading that gives meaning to all portions is possible.” (quoting Stratton v. Sarasota County, 983 So.2d 51, 55 (Fla. 2d DCA 2008))). Section 741.212(3) directs Florida courts to recognize as marriages—and restricts the term “spouse” to mean—those legal unions that have conferred a spousal status “as husband and wife.” To be a husband or wife, or a spouse, as we have already discussed, plainly connotes a marital relationship; section 741.212(3), when read as a whole, would simply reaffirm that proposition.
Secondly, as a matter of statutory construction, the term “only,” although capable of varying meanings depending on the context of its use as an adverb or an adjective, ordinarily imposes some limiting junction over the term or phrase it modifies. Cf. License Acquisitions, LLC v. Debary Real Estate Holdings, LLC, 155 So.3d 1137, 1145-46 (Fla. 2014) (summarizing various dictionary and thesaurus definitions of “only” when used as an adjective, including “solely,” “precisely,” “for no other purpose”; “[r]eferences to certain uses of ‘only in other statutory provisions suggest that the word has been used by the legislature to indicate a maximum amount”). The statute’s use of “only,” then, signals a clear intent to restrict the definitional scope of relationships that may be recognized as marriages to those that are, in fact, marriages. The probate court’s construction, however, broadens that recognition to all of a foreign jurisdiction’s domestic relationships as if they were marriages (so long as they constituted some kind of a legal union), even if that jurisdiction would hold they were not.
We find further support for our application of section 741.212(3) in the Fourth District’s appraisal of Colombian marital law in American Airlines v. Mejia, 766 So.2d 305 (Fla. 4th DCA 2000). In Mejia, a Columbian flight attendant died in a crash of an American Airlines airplane. Id. at 306. The plaintiff sued American Airlines for wrongful death, claiming that he was the flight attendant’s surviving spouse as her common law husband. Id. The plaintiff argued that while he and the decedent “never participated in a formal, civil or religious ceremony of marriage[,] ... they were entitled under Colombian law to claim the status of ‘Unión Marital de Hecho,’ ”[6] which, the plaintiff argued, was the equivalent of common law marriage in the United States. H. While the Mejia court acknowledged that Florida courts must respect a common law marriage validly created in a jurisdiction that recognizes such marriages, id. at 307 n.5, it concluded that Colombian law differentiated between marriage and union marital de hecho: “The principal difference for our purposes is that marriage is a solemn contract dissoluble only by death or divorce, while an unión is an informal circumstance that may be ended simply by one of the permanent companions marrying someone else.” Id. at 309. To this end, the Mejia court quoted with approval to the Colombian Constitutional Court’s reasoning, “to maintain that between permanent companions there exists a relationship identical to that which binds spouses is an assertion that would not hold up to the slightest scrutiny.” Id (quoting Corte Constitucional *1122 [C.C.] [Constitutional Court], mayo 31, 1994, Sentencia C-239/94, M.P. Jorge Arango Mejia, Gaceta de la Corte Constitucional [G.C.C.] (Colom.)). We agree with the Mejia court’s conclusion and find it apt to the case at bar. The status of a reputed spouse relationship cannot be identical to the status of a married spouse’s relationship because, under Israeli law, reputed spouses are not married and can informally end their relationships at any time without even seeking a divorce.
Our holding today also aligns with the New York Surrogate’s Court’s ruling on this precise issue of Israeli marital law. In Matter of Jenkins, 133 Misc.2d 420, 420-21, 506 N.Y.S.2d 1009 (N.Y. Sur. 1986), the court was confronted with the question of whether the petitioner had a claim to the decedent’s estate as the decedent’s surviving spouse. Like Ms. Shushan, the petitioner in Jenkins argued that she and the decedent had entered into a reputed spouse relationship in Israel. Id. at 421, 506 N.Y.S.2d 1009. The Jenkins court examined two Israeli statutes provided by the parties, which provided that individuals living together “as husband and wife in a common household,” .become entitled to certain rights upon the death of the other. Id. (citing Succession Law, 5725-1965, §§ 55, 57(c) (Isr.)). The Jenkins court found that the relationship described in the Israeli statutes provided by the parties, and in other Israeli statutes generally, did “not create a state of marriage, equivalent to a common-law marriage or a ceremonial marriage.” Id. at 426, 506 N.Y.S.2d 1009. In so concluding, the Jenkins court explained that although “[s]ome of these rights may be similar to or the same as those of married couples ... the conferring of these rights does not in Israel give the parties the status of husband and wife.” Id. (emphasis added).
As the courts in Mejia and Jenkins recognized, marriage, under the law, is not simply a bundle of rights and privileges; it is also a status. While we sense from the case before us that the line, as it were, between the statuses of reputed spouses and married couples in Israel has drawn closer over time, perhaps to a point of near proximity, even near equivalency,[7] nevertheless, as both of the experts who testified before the probate court concluded, that line remains firmly entrenched. For better or for worse, under Israeli law marriage is a different legal relationship than a reputed spouse relationship. To borrow from another ceremonious phrase, the two have not become one. Were we to hold otherwise and approximate a reputed spouse relationship as “close enough” for purposes of marriage, our court would simultaneously diminish, if only imperceptibly, the uniqueness of the marital status in the affairs of society and do offense to a sovereign nation’s authority to define, for itself, the precise boundaries of marriage within its own jurisdiction. Cf. Johnson, 571 So.2d at 542; Montano, 520 So.2d at 52-53; Betemariam, 48 So.3d at 125; Farah, 429 S.E.2d at 629. We cannot affirm such a construction of the law.
The dissent charges that this view of Israeli law amounts to a “myopic focus on the technical status of marriage.” True enough.[8] Comity requires us to look, close *1123 ly and carefully, at a foreign nation’s law in this case, not blur its distinctions. Our decision upholds a fíne—but very clear— distinction that has been set within Israel’s marital law, one we must maintain out of respect to Israel’s law-making authority. Because Ms. Shushan and the late Mr. Cohen’s legal union was not entered into through any recognized religious authority, they were not married under Israeli law. Ms. Shushan, therefore, could not be a surviving spouse of Mr. Cohen under section 732.102. Accordingly, we reverse the probate court’s order and remand this case for further proceedings consistent with this opinion.
Reversed and remanded.
CASANUEVA, J., Concurs.
KHOUZAM, J., Dissents with opinion.

. Ms. Rana passed away in 2000, predeceasing Mr. Cohen.

. The litigants, as well as their testifying experts, referred to Ms. Shushan’s domestic relationship with the decedent alternatively as "common law spouse,” "reputed spouse,” or a "spouse known in public." We suspect the differing nomenclature simply reflects the vagary inherent when trying to translate a Hebrew legal expression that apparently has no precise analog in the English language or in Anglo-American jurisprudence. For purposes of this opinion, we choose the term "reputed spouse” for no other reason than to avoid confusion between “common law spouse” and common law marriage—an equivalency that was expressly disclaimed by both experts who opined in the proceedings below.

. Neither party argued below or on appeal that recognition of an Israeli reputed spousal relationship as marriage would offend any public policy of the State of Florida in any way. See Johnson, 571 So.2d at 542 ("Florida law does not have to give full faith and credit to another State’s law when it is repugnant to the interest of Florida.”).

. In so holding, we have not ignored the institution of common law marriage, a form of marriage that exists in many jurisdictions that our dissenting colleague believes could be likened to the reputed spousal relationship. If only there were common law marriage in Israel, we could readily agree with much of our colleague's argument. But there isn’t. So we cannot credibly characterize the Israeli reputed spousal relationship within a legal institution that is not recognized and does not exist in Israel. See, e.g., Betemariam, 48 So.3d at 124 (applying the principle that the validity of a marriage is determined by the law of the place where it is contracted; “[t]he issue of whether the parties' religious wedding ceremony amounted to a valid marriage is determined in accordance with the law of the place where the putative marriage occurred” (citing Preure v, Benhadi-Djillali, 15 So.3d 877, 877 (Fla. 5th DCA 200?))). Nor does the legal presumption of a marriage’s validity the dissent cites carry the argument any farther, because the evidence of cohabitation before the probate court in this case would, at most, give rise to a presumptively valid common law marriage—which, again, is not a recognized form of marriage under Israeli law. Cf. In re Estate of Sterile, 902 So.2d 915, 919 n.4 (Fla. 2d DCA 2005) (observing that ”[i]n the reported Florida cases, evidence relating to general repute and cohabitation as husband and wife has generally been relied upon to establish a common law—rather than a ceremonial—marriage”). If we have limited our inquiry into "ceremonial” or "formal" marriages, then, it is only because Israel's marital law has set that limited boundary for us.

. See~ Obergefell, 135 S.Ct. 2584. The probate court in its order noted that Obergefell invalidated portions of section 741.212(3) but that any constitutional infirmities within the statute were not relevant to this case. We would agree with the probate court's assessment, but our- holding today rests principally on applying the. plain meaning of "spouse" within section 732.102. We have not been asked, and so we will not attempt, to definitively reconstruct the constitutionally nonoffensive provisions of section 741.212(3). We address section 741.212(3) only to point out where the probate court erred in its construction of that statute, and with the assumption those portions we have addressed may remain constitutionally valid.

. “Marital Union in Fact.” Mejia, 766 So.2d at 306 n.2.

. For example, Ms. Shushan points out that the Israeli Inheritance Registrar deemed her entitled to half of the decedent’s property in Israel as Mr. Cohen’s reputed spouse. While that may be so, that disposition of property . has no bearing on the question of whether Ms. Shushan and Mr. Cohen were lawfully married, which is the critical inquiry for purposes of applying Florida’s intestacy law to Mr. Cohen’s Florida assets. See In re Estate of Salathe, 703 So.2d 1167, 1169 (Fla. 2d DCA 1997) ("Unquestionably, Florida’s intestacy laws apply to the inheritance of property located in Florida.").

. Although we might quibble with the implication in our colleague’s choice of adjective *1123 that one lawful marriage might merely be "technical,” as opposed to another that would, presumably, hold more genuine legal significance. Under the law, one is either married, or one is not.